## Kelly Estate

*Bruce L. Smith, Eckels, Blystone, Fuller & Kinnunen,* for appellant.

*Max B. Maloney,* for Commonwealth.

THOMAS, P. J., July 23, 1968.—The Kelly Estate has appealed from assessment of a Pennsylvania inheritance tax in the amount of $1,004.61.

Edith A. Kelly died testate January 15, 1968. Settlement of her estate was attempted by petition under the small estates provision of the Fiduciaries Act of April 18, 1949, P. L. 512, 20 PS §320.202. The petition listed assets as a checking account ($299.40), household furnishings ($71), and timber rights ($400),

totalling $770.40. Debts consisted of the funeral expenses in the amount of $1,085. Settlement of this apparently insolvent estate on this petition was authorized by court order dated March 6, 1968. On March 28, 1968, Louise Turner, a legatee and coexecutor, filed the standard appraisal and debt forms required by the Department of Revenue. This form listed no real estate and the same three items of personal property valued at $770.40 previously listed in the small estate petition. Listed as an additional asset, valued at $7,400, was a *life estate* reserved to the decedent in two parcels of land in Rome Township by deed executed June 28, 1966, and recorded July 1, 1966, in Deed Book 421, page 291.[1]

Debts consisted of a funeral bill of $1,085, attorney's fees of $150, and headstone and cemetery expenses of $238. Another item of debt presents the crux of the problem now before us. This item of $12,564 claimed to be due Louise Turner obviously rendered the estate insolvent and consequently no inheritance tax was due. The Department of Revenue refused to allow this item of debt.

This debt item is described as follows:

"Louise Turner—Value of services (prospective as of March 1, 1966) which formed the consideration running from Louise Turner to Edith A. Kelly, decedent, which resulted in Edith A. Kelly deeding prem-

---

[1] We interpret this valuation as the full value of the two parcels as counsel for the estate apparently assumed this transfer to be a potentially taxable asset under one or more of the following sections of the Inheritance and Estate Tax Act of June 15, 1961, P. L. 373, 72 PS §2485-101, et seq.

Section 221—transfer during life without valuable consideration;
Section 222—transfer in contemplation of death;
Section 224—transfer reserving life estate in the transferor;
Section 225—a transfer by the terms of which the transferee promises to care for the transferor during the remainder of the transferor's life.

ises in Rome Township to Louise Turner by deed dated June 24, 1966. Value of services of Louise Turner to Edith A. Kelly computed at $150.00 per month for 6.98 years (life expectancy of Edith A. Kelly in 1966 at the time of the bargain based on 'Commissioners 1958 Standard Ordinary Mortality Table').

"6.98 years x 12 months x $150.00=$12,564.00".

### Factual Background

Edith A. Kelly lived alone in a house located on approximately 84 acres of farm land. For several years prior to 1966 she suffered ill health and in January 1966, a crippling arthritic condition became worse. She was committed to a hospital and the attending physician advised the family she could no longer live alone. Apparently the brothers and sisters were faced with a choice of placing her in a nursing home or securing someone to move into her home and administer supervisory care. The matter was discussed with Edith Kelly and, according to Louise Turner, her sister, an agreement was reached whereby Louise would move from the home she and her husband occupied and move in with her sister to care for her needs. In return for this care, which was anticipated to be for the remaining lifetime of Edith, the house and acreage would be "left" to Louise. In March of 1966, Louise moved into Edith's home under this arrangement. On or about April 12, 1966, in an apparent attempt to formalize the agreement between Louise and Edith, Louise went to an attorney's office and had a general warranty deed prepared conveying the 84 acres of land from Edith to Louise. The deed was witnessed and acknowledged April 19, 1966.

The deed reserved a life estate unto Edith. However it was Louise's testimony that the life estate reserved to Edith was inserted at Louise's suggestion and without Edith's knowledge. She did so to protect Edith in

the event that Louise predeceased her. At the direction of Louise this deed was not recorded, partly at least for the reason they had been negotiating a sale for a portion of the 84 acres and did not want the deed recorded until the outcome of the negotiations were finalized.

On June 24, 1966, the sale of a portion of the 84 acres was consummated and Louise returned her unrecorded deed to the attorney who voided the same and prepared a new deed from Edith to the purchaser Halfast, conveying the 84 acres but excepting an 11-acre parcel and a smaller three acre parcel upon which the dwelling house was located. Timber rights were also excepted. The consideration for the purchase was $5,000 which was paid to Louise and which she deposited in a special account at the bank and used the same to make needed repairs to the house. The funeral bill of $1,085 and grave stone cost were also ultimately paid from this fund.

At the same time the attorney prepared a *new* deed from Edith A. Kelly to Louise E. Turner for the two parcels excepted in the Halfast deed and reserving a life estate in said parcels to Edith.

Edith was too crippled to go to the attorney's office and Louise handled all the arrangements for the deeds and again had inserted the reserved life estate in Edith's favor for the same reason it was reserved in the first deed.

Edith's health continued to decline, she became confined to a wheel chair, required added attention and was hospitalized three days in August 1967, five days in November and December, 1967, and finally confined December 16, 1967, until her death January 15, 1968.

All witnesses stated they had no direct knowledge of the agreement between Edith and Louise, but the family plan was verified by Louise that if Louise took

care of Edith until her death she would receive the real estate as her consideration and that the deed of June 24, 1966, was the consummation of this agreement made in March, 1966.

After listening to the evidence, we are satisfied that the agreement to transfer the real estate and the deed in fulfillment of the agreement was not a gift in contemplation of death. While the health of Edith A. Kelly was not good at the time and her life expectancy problematical, the transfer was not primarily motivated or impelled by the thought of death as mandated by the terms of section 222 of the act, 72 PS §2485.222. Rather, the impelling and compelling reason was to assure something in the nature of a quid pro quo to the member of the family who would move to Edith's home and see that she was properly cared for in familiar surroundings in the twilight years of life. Accordingly, we reject the Commonwealth's contention that the transfer is taxable under section 222 as having been made in contemplation of death.

We also dismiss the contention of the estate that the reservation of the life estate cannot be binding upon the estate. It is argued that the reserved life estate was Louise's idea and that Edith had not requested this reservation and did not know it was in the deed when she signed and acknowledged the same. This contention flies in the face of the parol evidence rule and offers a classic example of a factual situation justifying the strict application of this much eroded rule of evidence. If contracts, particularly deeds, can be altered, changed or modified by the grantee after the death of the grantor in the manner attempted here, no attorney or title company could safely certify a real estate title for his client.

As we analyze the contention of Louise Turner, she is contending that it is illegal as well as grossly inequitable to collect an inheritance tax from her on the

full value of the real estate when it was conveyed subject to her duty to furnish services in return. What Louise is basically arguing is that she is being penalized for entering into this compassionate agreement because there would have been no tax, or at least less tax, if alternative arrangements had been made. For example: 1. Edith could have kept title to the real estate, entered into a written contract with Louise to care for her for a fixed sum or at a monthly rate, payable on her death, which would have been an irrefutable debt of the estate; or 2. Edith could have sold the real estate, used the proceeds to pay Louise monthly, or paid her a lump sum for care for the rest of her life and thus would have substantially reduced the assets of her estate and correspondingly the inheritance tax; or 3. Edith could have mortgaged the property, used the proceeds to pay Louise and the mortgage would then have been an estate debt that reduced the tax liability of the estate. Estate planners could have devised other ways to eliminate or reduce the inheritance tax under this given factual situation if all of the facts were known and the attorney's advice requested. It appears, however, that either the attorney's advice was not asked or he was merely retained to draw two deeds to accomplish a desired family plan for the care of a disabled loved one unmindful or regardless of the future inheritance tax consequences.

We cannot find after listening to the testimony that the transfer of the real estate in this case was made with any intention to avoid the consequences of the inheritance tax. As stated before, the primary motivating factor was to compensate the member of the family who stepped forward with the compassion to give up her own family living and devote her time to the care of the seriously ill member of the family. This contractual arrangement having been accomplished through an inter vivos transfer, the resolution of the taxabil-

ity of the transfer must be found in the interpretation of the language of sections 221, 224 and 225 of the Inheritance and Estate Tax Act of June 15, 1961, 72 PS §2485.221, 224 and 225.

Since sections 224 and 225 require a transaction conforming to section 221(a), a careful reading of this section is in order.

"(a) Consideration. All transfers of property, specified in sections 222-226, which are made during his lifetime by a resident or a non-resident, to the extent that they are made without valuable and adequate consideration in money or money's worth at the time of transfer, are subject to tax under this act".

The intent of this section was obviously to preclude inter vivos transfers without consideration so as to deprive the state of its taxable share of decedent's property at death. The problem then is to determine the meaning of "adequate and full consideration in money or money's worth". There is an apparent dearth of Pennsylvania cases dwelling on this particular problem. The problem of what consideration is adequate to avoid classification of a transfer as taxable seems to be essentially the same as that involving what is adequate consideration to support the deductibility of a claim against a decedent's estate under sections 631 and 632.[2]

Obviously, section 221 was designed to *exclude* inter vivos transfers for which appropriate consideration was received for all or a portion of the transfer.

Section 224 reads as follows:

---

[2] Section 632 uses slightly different language in authorizing indebtedness of the decedent "when founded upon a promise or agreement . . . to the extent that it was contracted bona fide and for adequate and full consideration in money or money's worth". See discussion in Pennsylvania Inheritance & Estate Tax, Grossman & Smith, p. 95, 327 and 328.

"A transfer conforming to section 221 (a), and under which the transferor expressly or impliedly reserves for his life or any period which does not in fact end before his death,

"(1) the possession or enjoyment of, or the right to the income from, the property transferred, or . . ."

Section 225 reads as follows:

"A transfer conforming to section 221 (a), and under which the transferee promises to make payments to, or for the benefit of, the transferor or to care for the transferor during the remainder of the transferor's life, is subject to tax under this act."

These sections have as their premise the fact that the inter vivos transfer is conditioned upon section 221 and, accordingly, if an inter vivos transfer is made for valuable consideration, the fact that a life estate was retained or a promise made to care for the transferor would not destroy the tax free aspect of the transfer. Certainly under our factual finding in this case, Louise Turner gave valuable and adequate consideration in the form of promised future services to her sister in return for the real estate. This consideration had already been extended on a day to day basis for about a month before the first deed was signed. To the extent of the consideration extended, we believe this inter vivos transfer should be tax free to Louise Turner.

The problem then resolves itself into determining what the consideration was or to ascertaining a formula by which it can be reasonably measured. We find no cases directly in point but an analogous problem has come before the courts in Stone Estate, 81 D. & C. 60 (1952), and Wilson's Estate, 40 D. & C. 468 (1940).

In Wilson, T & W conveyed property in trust providing that A & B were to live in the property with

them and perform nursing services for T & W and upon the death of T & W the trustee was to convey the property to A & B. If the property was sold during the lifetime of the trust, A & B were to receive a mathematically calculated portion of the proceeds. Upon the survivor's death, this lifetime conveyance in trust to A & B was held taxable but only to the extent the property value *exceeded* the amount A & B would have received for their services under the mathematical formula had it been sold.

In Stone, the decedent, upon admission to a home, entered into an agreement whereby she assigned to the home all of her estate which she then owned or thereafter acquired. A release clause was included in the agreement providing she could withdraw from the home and established a mathematical formula for computing the amount of maintenance expense the home could retain from her total assets in the event of withdrawal. Upon the decedent's death as a resident of the home, the State attempted to tax the entire value of the decedent's estate but the court reduced the taxable value of the estate by $3,554, the amount prescribed by the formula established in the agreement as the value of maintenance services in the event the decedent had withdrawn from the home. The court in Stone Estate herein noted as follows:

" 'Certainly the Legislature did not intend by the Transfer Inheritance Tax Act of June 20, 1919, and its amendments, that the money used by an executor or administrator to pay the debts a deceased debtor intended to have paid only after his death should be subject to a transfer tax. Many individuals late in life incur debts whose payments they do not intend to be made until after their death, for the reason that their chief assets consist of the promises in their life insurance policies or because their estate is in such form that their debts cannot be liquidated until their

estate is converted into money or its equivalent. If the money received by a creditor in payment of a debt from a decedent is subject to an inheritance tax because the debtor's intention was that the payment should be made only after his death it is impossible to find any reason why *all* moneys received by creditors after the death of their debtors should not be taxed, provided both creditor and debtor intended or knew that the debt would not be paid until after the debtor's death. There is no basis for a logical distinction in imposing 'transfer taxes', between a transfer of money from a decedent's estate to pay his general debts and a transfer of money from a decedent's estate to pay a debt whose time of payment was formally fixed 'at or after his death' . . . . "

"Further:

" 'The very name "Transfer Inheritance Tax" by which the tax imposed by the Act of 1919 is generally referred to indicates that the transfer which is taxable arises from an inheritance and not from a creditor-debtor relationship based on a contract' ".

A similar problem is presented in Armstrong Estate, 3 D. & C. 2d 285 (1955), where an absolute assignment of decedent's assets to the Presbyterian Home presented tax problems. The court therein found the total taxable estate should be reduced by the cost of decedent's maintenance in the home and found a tax liability for the balance of the estate not consumed by the mathematical maintenance formula.

These cases however are not totally analogous to the problem presented to us here. The closest case we find to the factual situation confronting us in the Kelly Estate is Oberholzer's Estate, 49 D. & C. 230 (1943). While decided under the terms of the 1919 Transfer Inheritance Tax Act and its amendments, it seems applicable to the present 1961 Act and the factual situation of this case. Oberholzer specifically held that the

reservation of a life interest to the grantor in a deed conveying real estate *for a valuable consideration* does not constitute a transfer of property subject to tax under the Transfer Inheritance Tax Act of 1919, as amended, as it was not a transfer made in contemplation of death or intended to take effect in possession or enjoyment after the grantor's death. In this case the decedent conveyed two parcels of real estate to a trustee for the use of a minor for which a consideration of $3,500 was paid. Decedent reserved a life estate unto herself. Upon decedent's death, the Commonwealth attempted to collect a transfer inheritance tax on the full value of the property. It should be noted, however, that a fixed monetary consideration was paid *at the time of transfer.*

On construing a tax statute, all doubts should be resolved in favor of the taxpayer and most strongly against the taxing authority: Pickering Estate, 410 Pa. 638, 190 A. 2d 132 (1963).

Should Louise Turner be required to pay the transfer inheritance tax on $7,400, the value of the real estate herein, simply because the consideration while promised at the time of transfer happened to be paid ad seriatim by her daily service in caring for her sister from the time she went to live with her until her sister's ultimate passing? [3] We think not. The intention of section 221 (a) was obviously to exempt inter vivos transfers where consideration was received. We visualize Louise as more of a creditor of the estate rather than a gratuitous transferee — or perhaps as a trustee, owning the property so long as she faithfully performed her end of the bargain. Simply because the consideration was not capable of mathematical certainty at the time of the transfer should not work to

---

[3] As noted before, approximately one month of service had already been extended at the time of actual transfer.

the disadvantage of the transferee creditor, if at the time of death the said consideration can be reasonably determined. The testimony as to the value of Louise Turner's service was meager but certainly the figure of $150 per month for her services alluded to at the hearing is a fair and reasonable amount in view of the present day difficulty of securing "live-in companions", "practical nurses", or "full time housekeepers", particularly when the ward is in declining health. We, therefore, accept as fair and reasonable the sum of $150 per month for the services rendered by the sister from March 18, 1966, until January 15, 1968. We believe that a mere naked promise to care for the transferor during the remainder of the transferor's life would of itself be insufficient to escape the inheritance tax; but if the promise is translated into tangible consideration by the extension of the promised care in conformity with the agreement, we believe the transfer of the property in return for this promise would be nontaxable to the extent of the care actually extended. But the estate's contention that we should establish as the consideration for this transfer the sum of $12,564 is unrealistic.[4]

The intent of the Inheritance and Estate Tax Act is to tax inheritances and gifts and not to tax that which a person has already paid valuable consideration for. Louise Turner, on the death of her sister, Edith Kelly, did not inherit in fee simple a piece of real estate worth $7,400. What she inherited was $7,400 worth of real estate, a portion of which she had paid for by her continuous care, supervision and nursing of her sister at the rate of $150 per month.

We believe equity, justice, common sense and fairness require us to reduce the appraised value of this

---

[4] $12,564 was arrived at by the estate by multiplying the life expectancy of Edith Kelly—6.98 years x 12 months, at $150 per month.

real estate by the sum of $3,300, being 22 months of care from on or about March 18, 1966 to January 15, 1968. Accordingly, the valuation of said real estate is reduced to the sum of $4,100 and the Register of Wills is directed to reassess the inheritance tax using this valuation.

## ORDER

And now, July 23, 1968, the appeal from assessment of inheritance tax on behalf of Louise Turner is sustained to the extent that the Register of Wills is directed to reduce the appraised value of the real estate to $4,100 in accordance with the foregoing opinion.